UNITED STATES DISTRICT COURT
EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

SUSAN ROWE,

        Plaintiff,         Civil Action No.: 14-14498
                                  Magistrate Judge Elizabeth A. Stafford
        v.

CAROLYN W. COLVIN,
Acting Commissioner of
Social Security,

        Defendant.
_____/

**OPINION AND ORDER ON PLAINTIFF'S MOTION FOR REMAND [R. 15]
AND DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [R. 17]**

      Plaintiff Susan Rowe appeals a final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplement Security Income ("SSI") under the Social Security Act (the "Act").  Both parties consented to conduct all proceedings before this Court [R. 21].  For the reasons stated on the record during the hearing on December 10, 2015, and as described below, the Court **GRANTS** Rowe's motion for remand **[R. 15]** and **DENIES** the Commissioner's motion for summary judgment **[R. 17].**

I.  ANALYSIS

Rowe raises two issues: (1) that the administrative law judge (ALJ) failed to properly consider the treating physicians' opinions; and (2) that the ALJ failed to consider the lay testimony of Robert Pratchshler, Jr., who is Rowe's live-in boyfriend. Both of these arguments have merit.

A.

The ALJ failed to properly consider the opinions of Kevin B. Robinson, M.D., an orthopedic surgeon who regularly treated Rowe beginning in January 2010. Before addressing the ALJ's treatment of Dr. Robinson's opinions, it is necessary to discuss Rowe's relevant orthopedic treatment,[1] which included five surgical procedures and several setbacks between her August 2009 onset date and the July 2013 hearing date.

Rowe twisted her left knee on July 24, 2009 while working as a certified nursing assistant. [R. 12-7, Tr. 339, 344, 372]. She was thereafter found incapable of working and referred to orthopedic specialist William Martin, M.D. [*Id.*, Tr. 344, 366]. In September 2009, an MRI revealed that Rowe had a meniscus tear, and Dr. Martin conducted a left knee partial meniscectomy and chondroplasty of the patella the following month. [*Id.*,

---

[1] This medical history will not include discussion of Rowe's physical therapy or evaluations by non-treating sources. That evidence is relevant to the overall question regarding Rowe's eligibility for DIB or SSI benefits, but not essential for the questions currently before the Court.

2

Tr. 344-47, 349]. Dr. Martin put Rowe on off-work status until November 11, but she remained symptomatic after that date, and thus sought emergency room relief for knee pain and numbness from her knee to her foot on November 13. [*Id.*, Tr. 357-59].

Dr. Robinson took over Rowe's orthopedic care in January 2010, at which time he diagnosed her with a medial meniscus tear, anterior horn tear and MCL sprain, prescribed physical therapy and issued her an off-work slip until February 22, 2010. [*Id.*, Tr. 337-39, 342; R. 12-8, Tr. 626-28]. A few days later, an MRI confirmed another meniscus tear within the left knee, so Dr. Robinson performed an arthroscopic surgery in February 2010. [R. 12-7, Tr. 282-85, 340-41, 479-80; R. 12-8, Tr. 624].

Dr. Robinson initially issued Rowe an off-work slip with an expected return of March 29, 2010. [R. 12-7, Tr. 456; R. 12-8, Tr. 624, 643]. However, he extended Rowe's off-work status until June 10, 2010 based on later clinical exam findings, including pain, swelling, spasms, muscle atrophy, use of a cane, tenderness, and the like. [R. 12-8, Tr. 609, 613, 616, 620, 640-42]. Afterwards, Rowe wanted to try to return to work, which Dr. Robinson permitted with restrictions. [R. 12-8, Tr. 592, 594, 600, 605, 636-39]. However, by mid-November 2010, Rowe was complaining of severe knee pain, and presented with an antalgic gait, tenderness, and

atrophy of a calf muscle. [*Id.*, Tr. 558]. Dr. Robinson and Rowe agreed to knee replacement surgery, which was originally slated for January 2011, but did not occur until August 2011. [R. 12-7, Tr. 398, 427-28, 490-92; R. 12-8, Tr. 581, 584]. Dr. Robinson issued Rowe off-work slips and completed an application for a handicapped parking pass for six months after surgery, indicating that Rowe could not walk more than 200 feet without having to stop and rest due to arthritis in her left knee and planned partial knee replacement. [R. 12-7, Tr. 398; R. 12-8, Tr. 579, 635].

On November 3, 2011, after a course of physical therapy, Rowe returned to Dr. Robinson reporting a desire to return to work, despite the presence of an antalgic gait, discomfort with ambulation and pain radiating to her left groin, back and buttocks. [R. 12-8, Tr. 569]. Dr. Robinson suggested hip injections, and issued Rowe a work slip limiting her to no more than an 8-hour day. [*Id.*, Tr. 569, 634]. A month later, Rowe returned complaining of severe left hip and low back pain. [*Id.*, Tr. 568]. Upon examination, she was found to have an antalgic gait, minimal left knee joint effusion, some lower back spasm, an exquisitely tender sacroiliac joint, and pain with passive range of motion of her hip. [*Id.*]. Dr. Robinson prescribed hip and sacroiliac joint injections. [*Id.*].

In January 2012, Rowe returned reporting no improvement after the

4

sacroiliac joint injection, and was found to have a significantly antalgic gait, paresthesia on palpitation of the left leg, a positive straight leg raising test and significant discomfort with passive range of motion of her left hip. [*Id.*, Tr. 565]. She was diagnosed with a possible herniated nucleus pulposus at L5-S1 with radiculopathy, so Dr. Robinson ordered an MRI and gave her an off-work note. [*Id.*]. The MRI showed degenerative disc disease and mild foraminal narrowing at L3-4 and L4-5, a broad based disc protrusion at L3-4 with thecal sac effacement, and a disc bulge at L4-5. [R. 12-7, Tr. 391].

   In February 2012, Dr. Robinson administered a hip injection, which was a surgical procedure requiring general anesthesia. [R. 12-7, Tr. 423-24]. He thereafter signed another off-work slip until April 2012, and another application for a handicapped parking placard, stating that she could not walk more than 200 feet without having to stop and rest. [*Id.*, Tr. 397, 423-24; R. 12-8, Tr. 633]. In March, Rowe treated at a pain clinic where she received three spinal injections, but she told Dr. Robinson afterwards that her back and hip felt worse. [*Id.*, Tr. 541-51, 557-58]. At that April 2012 appointment, she presented as very uncomfortable, with hip pain and some calf numbness. [*Id.*, Tr. 557-58]. Rowe requested another injection but, two weeks later, she presented to Dr. Robinson with no improvement and exhibiting severe pain with limited hip range of motion, a positive straight

5

leg raising test on the left, sacroiliac joint tenderness and a slight limp. Despite the risks discussed, Rowe elected to have hip surgery, which she underwent in June. [*Id.*, Tr. 554-58]. Dr. Robinson recommended that Rowe remain off work "secondary to her knee, hip and back problems" until about August 2012. [*Id.*, Tr. 558; R. 12-9, Tr. 781]. Due to complications, Rowe emerged from surgery with her left leg slightly longer than her right. [*Id.*, Tr. 686-87, 740-42].

In October 2012, Dr. Robinson noted that Rowe had an antalgic gait, tenderness over the gluteus, and pain with active hip range of motion. [R. 12-9, Tr. 773-74]. He found that her radiculopathy had been improving, but recommended continuing physical therapy and that she remain off work until her next follow-up appointment. [*Id.*].

Dr. Robinson saw Rowe again in January 2013, at which time she reported constant pain, difficulty getting in and out of bed due to spasms, and difficulty squatting, kneeling, stairs, walking and standing. [*Id.*, Tr. 770-72]. An exam revealed moderate pain, spasm and tenderness along the left paravertebral muscles, restricted left hip range of motion, and tenderness over the trochanter and the left knee. [*Id.*]. Dr. Robinson diagnosed trochanteric bursitis, prescribed more physical therapy and continued her medications. [*Id.*].

6

A month later, Rowe reinjured her left knee and hip after slipping on ice and falling on the left side of her body, necessitating emergency room treatment. [R. 12-8, Tr. 688-98]. Three days later, on February 5, 2013, Dr. Robinson observed Rowe to have an antalgic gait, obvious atrophy of the left buttock, good hip range of motion without discomfort, but tenderness in her left buttocks, sacroiliac joint and patella. [R. 12-9, Tr. 766-79]. He diagnosed her with a knee and hip contusion and recommended conservative treatment, along with limited activities, including that she remain off work until February 2014. [*Id.*].

Dr. Robinson continued to treat Rowe again in March, April and May of 2013. She reported difficulty with lying on her left hip, stairs, weight bearing, walking and standing, and had an antalgic gait and atrophy of her left thigh and buttocks, with tenderness over her sacroiliac joint and trochanter, but no pain with range of motion. [*Id.*, Tr. 760-74]. In April, Dr. Robinson opined, "At this time I do not believe that she can return to her previous level of work or any gainful employment because of pain and dysfunction." [*Id.*, Tr. 761]. The following month, Dr. Robinson indicated that Rowe was making some progress with conservative treatment and he was continuing her treatment plan unchanged. [*Id.*, Tr. 757-59].

On May 23, 2013, Dr. Robinson completed a disability application for

7

Rowe to discharge her student loan, diagnosing her with post-traumatic osteoarthritis of the left knee, osteoarthritis of the left hip and lumbago, and opining that she was unable to walk, sit or stand for more than an hour at a time and could lift nothing greater than ten pounds.  [R. 12-6, Tr. 260-61]. Per the requirements of the application, (although the copy of the form in the record is difficult to read), Dr. Robinson certified that Rowe's condition prevented her from engaging in substantial gainful activity and that it had lasted or could be expected to last at least 60 months.  [*Id.*].[2]

**B.**

The "treating physician rule" requires an ALJ to give controlling weight to a treating physician's opinion regarding the nature and severity of a claimant's condition when that opinion is well-supported by medically acceptable clinical and diagnostic evidence, and not inconsistent with other substantial evidence.  *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 723, 727-29 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242-43 (6th Cir. 2007). If an ALJ gives less than controlling weight to a treating source's opinion, she must provide "good reasons" for doing so that are "supported by the evidence in the case record, and … sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave

---

[2] https://www.disabilitydischarge.com/Forms/

8

to the treating source's medical opinion and the reasons for that weight." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527(c)(2); SSR 96–2p, 1996 WL 374188, at *5 (July 2, 1996)).  "Even when not controlling, however, the ALJ must consider certain factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability of the physician's conclusions; the specialization of the physician; and any other relevant factors," and give appropriate weight to the opinion.  *Gentry*, 741 F.3d at 723.  This procedural safeguard not only permits "meaningful appellate review," but also ensures that claimants "understand the disposition of their cases."  *Rogers*, 486 F.2d at 242–43 (internal quotation marks and citation omitted).  The Court will "not hesitate to remand" when an ALJ's opinion "do[es] not comprehensively set forth the reasons for the weight assigned to a treating physician's opinion."  *Cole v. Astrue*, 661 F.3d 931, 939 (6th Cir. 2011) (internal quotation marks and citation omitted).

The treating physician rule is predicated on the detailed, longitudinal picture and unique perspective that such sources provide:

> 'Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of

9

individual examinations, such as consultative examinations or brief hospitalizations.'

*Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011) (quoting 20 C.F.R. § 404.1527(d)(2)). For these reasons, a treating physician's opinion is entitled to great deference in all cases. *Gentry*, 741 F.3d at 723.

In contradiction to the treating physician rule, the ALJ dedicated the majority of her analysis to detailing the findings of non-treating examiners, and she did not address the detailed, longitudinal picture provided by Dr. Robinson in his records and opinions. The ALJ's scant analysis of Dr. Robinson's opinions was as follows:

> Kevin Robinson, M.D., the claimant's primary treating physician, opined that the claimant is unable to return to work until February 6, 2014. (Exhibit 12F). Dr. Robinson subsequently stated that the claimant would be unable to perform any work due to pain and dysfunction. (Exhibit 16F). The issue is whether a claimant is disabled is a legal determination reserved to the Commissioner (20 CFR 404.1527(e), 416.927(e), and Social Security Ruling 96-5p). Further, Dr. Robinson's opinion is inconsistent with the opinion Dr. Grey, a state agency reviewing physician, who is familiar with the medical requirements of the Social Security disability program. (Exhibit 1A). Moreover, Dr. Robinson's opinion is inconsistent with the claimant's level of activity during the relevant period, in which she was able to attain an Associate's degree, perform some household chores, and some yard work. Therefore, I assign little weight to Dr. Robinson's opinion.

(R. 12-2, Tr. 39).

10

This analysis is troublingly not only because it gives short shrift to Dr. Robinson's extensive records and opinions; there are several other deficiencies. First, the ALJ referred only to two of Dr. Robinson's off-work restrictions, whereas he imposed a no-work restriction at least 15 times, often prior to and following surgeries.[3] See *Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003) (claimants need period of recovery following surgery). Generally, Dr. Robinson's no-work restrictions were time-limited, and both he and Rowe appeared to anticipate that she would recover and return to active employment. However, over and over, Rowe suffered setbacks requiring surgical or other intervention. This longitudinal picture and the support it provided for Dr. Robinson's opinions were completely ignored by the ALJ.[4]

Additionally, Dr. Robinson provided medical opinions that described the nature and severity of Rowe's conditions, and that were therefore entitled to controlling weight. *Gentry*, 741 F.3d at 723, 727-29; *Rogers*, 486 F.3d at 242-43. Specifically, Dr. Robinson signed the March 2011 and

---

[3] Dr. Robinson indicated that Rowe could not work on January 26, 2010, February 5, 2010, February 25, 2010, March 12, 2010, March 25, 2010, May 27, 2010, June 10, 2010, November 18, 2010, March 1, 2011, July 15, 2011, November 3, 2011, February 14, 2012, May 8, 2012, February 5, 2013 and April 30, 2013.

[4] The multiple surgeries and other setbacks that Rowe suffered call into question whether she was disabled for at least a closed-period. See *Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003).

11

February 2012 applications for handicapped placards that limited Rowe to walking no more than 200 feet without needing to rest, and the May 23, 2013 disability discharge form indicating that Rowe could not walk, sit or stand for longer than an hour at a time or lift greater than ten pounds. [R. 12-6, Tr. 260; R. 12-7, Tr. 397-98]. These opinions fall within the treating physician rule. "The form of the opinion is not relevant as long as the opinion has some basis in the medical record." *Bailey v. Astrue*, No. CIV-09-281-FHS, 2010 WL 3834406, at *4 (E.D. Okla. Sept. 14, 2010) *report and recommendation adopted*, No. CIV-09-281-FHS-KEW, 2010 WL 3856168 (E.D. Okla. Sept. 29, 2010). *See also Grabczyk v. Astrue*, No. CIV.A. 09-CV-02155, 2010 WL 3894113, at *8 (D. Colo. Sept. 30, 2010) (disabled parking permit form was a medical opinion).

Importantly, if given controlling weight, Dr. Robinson's opinion that Rowe could not sit for longer than an hour at a time would disqualify her from sedentary work, which contemplates sitting for six out of eight hours. *Moeller v. Comm'r of Soc. Sec.*, 489 F. App'x 868, 870 (6th Cir. 2012) (citing S.S.R. 96–9P, 1996 WL 374185, at *3). In that case, the ALJ's finding that Rowe has the residual functional capacity to perform sedentary work would be invalid. [R. 12-2, Tr. 35].

The ALJ's reliance on the opinion of state agency reviewing physician

Natalie Gray, M.D., to discount the weight given to Dr. Robinson's opinions was clearly erroneous. Generally, more weight is accorded to the opinions of treating physicians than to one-time examining or record-reviewing physicians, unless proper analysis of the factors for evaluating those opinions supports a contrary conclusion. § 404.1527(c)(2); *Gayheart,* 710 F.3d at 380; *Douglas v. Comm'r of Soc. Sec.*, 832 F. Supp. 2d 813, 824 (S.D. Ohio 2011). Here, the ALJ did not properly analyze the factors of supportability, consistency and specialization required by § 404.1527(c)(2). She did not find Dr. Gray's opinion to be more supportable or consistent with the record; she in fact gave Dr. Gray's opinion only limited weight. [R. 12-2, Tr. 39]. Nor did the ALJ consider specialization, as evident by the fact that she misidentified Dr. Robinson as being Rowe's primary treating physician rather than her orthopedic surgeon. [*Id.*].

The ALJ's conclusory reference to Rowe's activities of daily living as a reason for giving little weight to Dr. Robinson's opinions also lacks merit. The ALJ cited Rowe's ability to obtain an associate's degree, do "some household chores, and some yard work" as being inconsistent with Dr. Robinson's opinion. [R. 12-2, Tr. 39]. "Yet these somewhat minimal daily functions are not comparable to typical work activities." *Rogers,* 486 F.3d at 248. Moreover, the ALJ's "fail[ed] to examine the physical effects

13

coextensive with the[ ] performance" of these daily activities, including that Rowe had to perform some incrementally, required assistance for others, and completed her associate's degree online. *Id.* at 248-49; [R. 12-2, Tr. 63-64, 66-68; R. 12-7, Tr. 378].

For these reasons, the Court finds that the ALJ failed to properly consider Dr. Robinson's medical records and opinions, or to give good reasons for giving limited weight to those opinions.

### C.

Rowe argues that the ALJ erred in failing to consider Pratchshler's lay testimony. According to 20 C.F.R. § 404.1513(d)(4), the ALJ may consider non-medical sources including family members and friends. The Sixth Circuit has, furthermore, found that an ALJ's duty to investigate and fully develop the record requires consideration of available lay witness testimony. "If lay witness testimony is provided, the ALJ cannot disregard it without comment, and must give reasons for not crediting the testimony that are germane to each witness." *Maloney v. Comm'r of Soc. Sec.*, 480 Fed. Appx. *804, *810 (6th Cir. 2012). Nonetheless, an ALJ's insufficient consideration of lay witness testimony is harmless error unless it would affect the disability decision and is fully supported by the reports of treating physicians. *Id.; Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004).

Here, Pratchshler testified that Rowe must lay down or recline several times a day due to pain, needs help with chores, has a hard time walking more than 20 to 30 minutes and must rest afterwards, and takes an inordinate amount of time mowing the lawn using their riding mower. [R. 12-2, Tr. 80-82]. This testimony is consistent with Dr. Robinson's opinions regarding Rowe's sitting, walking and standing limitations, and general inability to engage in full-time employment. Thus, Pratchshler's testimony undermines the ALJ's reliance on Rowe's daily activities as a justification for discounting Dr. Robinson's opinion, and the ALJ's disregard of his testimony is not harmless.

If, on remand, the ALJ determines that Pratchscher's testimony lacks credibility, she must support that conclusion with sufficiently specific reasoning to allow for meaningful review. *Maloney,* 480 Fed. Appx. at *810; *Rogers,* 486 F.3d at 248.

### D.

For the reasons stated above, the Court remands this matter to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for proceedings consistent with this opinion. On remand, the ALJ shall consider the record evidence and should solicit any other evidence necessary to make an appropriate decision.

**IT IS SO ORDERED.**

                                              s/Elizabeth A. Stafford
                                              ELIZABETH A. STAFFORD
                                              United States Magistrate Judge

Dated: December 17, 2015

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on December 17, 2015.

                                              s/Marlena Williams
                                              MARLENA WILLIAMS
                                              Case Manager